Filed 9/19/13  In re K.P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.P. et al.,<br><br>        Defendants and Appellants. | D063252<br><br>(Super. Ct. Nos. NJ14711A/C/E/F) |

APPEAL from orders of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant M.P.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant A.P.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Erica C. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Minors.

Defendants and appellants M.P. (mother) and A.P., Sr., (father) each contend the evidence was insufficient to support the jurisdictional finding of the juvenile court that their minor son, Jo., was at substantial risk of being sexually abused as provided in Welfare and Institutions Code[1] section 300, subdivision (j) based on the undisputed finding that father repeatedly, over the course of years, sexually molested Jo.'s older sister, K.

Father separately contends there was insufficient evidence to support the allegation in Jo.'s section 300 petition that father "dabbled in child pornography." Finally, mother alone contends the record is devoid of clear and convincing evidence to support the removal of K., T., C. and Jo. from her custody under section 361, subdivision (c)(4).

As we explain, we conclude there is substantial evidence in the record to support the true finding under section 300, subdivision (j) that Jo. was at substantial risk of being sexually abused. We also conclude there is sufficient evidence in the record to support the finding that father "dabbled in child pornography." Finally, we conclude there is clear and convincing evidence in the record to support the findings and order based

---

[1] All statutory references are to the Welfare and Institutions Code.

thereon removing K., T., C. and Jo. from mother's custody under section 361, subdivision (c)(4).

OVERVIEW

A. *Background*

Mother and father have 11 children, four of whom are the subject of this appeal. In September 2012, plaintiff and respondent San Diego County Health and Human Services Agency (agency) filed a petition under section 300, subdivision (d) on behalf of 17-year-old K. alleging that over a seven-year period father sexually abused his daughter by digitally penetrating her vagina repeatedly and by forcing her to touch his penis. The petition further alleged K. reported the sexual abuse to mother; mother admitted father had viewed child pornography; and mother failed to protect K. from father's sexual abuse. The agency also filed petitions on behalf of 15-year-old A., Jr., 13-year-old T., 10-year-old J., 8-year-old C., 6-year-old Jo., 4-year-old E. and 2-year-old Av. alleging they too were at risk of being sexually abused in light of mother's failure to protect.

The agency's September 2012 detention report stated mother contacted the child abuse hotline in mid-August 2012 and reported that K. had disclosed she had been sexually assaulted by father over a seven-year period and as recently as February 2012. K. stated father would spit on his finger for lubrication and then insert his finger into her vagina, moving it in and out of her. K. stated the sexual abuse by father began when she was about five or six years old and lasted until she was about 12. Father told K. he was

3

merely "'tickling'" her when he engaged in the sexual abuse, and she was to keep it a secret.

K. said she was sexually abused by father in her parents' bedroom in the middle of the night after she would awaken and climb into their bed for comfort and affection. Father would put her under the blanket and insert his finger into her vagina after he spit on it. She described this abuse as happening "'often.'"

K. said the sexual abuse also occurred in the bedroom she shared with her sister T. Father would enter the bedroom, take off K.'s pants, spit on his finger and penetrate K.'s vagina as she lay in the top bunk of the bunk bed she shared with T. Father told T. he was "'tickling'" K. T. told father she also wanted to be "tickled," but father only touched K. K. reported this abuse by father would go on "'for a few hours'" and she "'was not laughing.'"

K. said the sexual abuse by her father occurred about twice a week. The majority of the sexual abuse occurred in the family's three-bedroom home, including on a few occasions in the garage where father had his office. K. said her vagina felt "'weird,'" "'painful'" and "'slimy'" from father's saliva after the molestation.

K. recalled one instance of sexual abuse by father that occurred as father was driving K. and her siblings home from Los Angeles. K. rode in the front seat of father's car while her siblings slept in the back seat. At some point, father pulled over, retrieved a jacket or sweater from the trunk of the car, undressed K. and put the jacket or sweater

over her.  Father then put his finger in K.'s vagina.  K. reported the "'whole ride home'" she had to "'deal with'" father touching her vagina.

When they got home, father put K.'s siblings to bed and then took her to his own bed.  Father then "'reached [K.'s] hand over to feel his penis,'" but she moved her hand away.  He then "'put his penis really close to [K.'s] vagina and [she] moved away fast after that.'"

At the age of 12, K. was diagnosed with ovarian cysts.  As a result, K. experienced some stomach pain.  K. recalled being in the car with father when he drew a picture of a vagina and some nerves to show K. how his tickling her vagina caused endorphins to be released and made her feel better.

K. finally told father she did not want him touching her vagina anymore.  K. told father, "'Dad I don't want you to do this anymore, you have a wife and you can [do] that to her, this is really hurting me.'"  K. also told father his touching "'was very wrong.'"  According to K., father became sad and repeatedly said, "'but you're my tickle buddy.'"  K. felt guilty after she told father to stop touching her vagina.

In February 2012, K. reported she became ill after a root canal.  As K. was resting, father came into the room and lay behind her in what K. described to law enforcement as a "'weird'" position.  As father began to move "'a little behind'" K., mother and T. walked in unexpectedly.  Mother told father to get up and said to father, "'that's a very awkward position.'"  K. did not tell mother then about father's past sexual abuse, but K. did pray mother would "'catch'" father sexually abusing her.

5

K. finally disclosed the sexual abuse by father in mid-August 2012 after she and T. argued. At the time, the family was living in tents and a trailer. After T. and K. argued, T. told mother she was jealous of K. K. in return said she was tired of hearing about her siblings' jealousy. K. said, "'People think that me and [d]ad have such a good relationship [and] that nothing bad ever happens to me and him.'" She then said, "'The truth is he hurt me physically and emotionally.'"

Mother asked T. to leave the room and, for the first time, K. disclosed the sexual abuse by father. Mother cried. She then packed up their belongings, left the campsite and contacted the police.

Mother told the responding officer from the San Diego County Sheriff's Department that she had confronted father with K.'s disclosure and that he calmly denied the allegations. Mother also reported that father had written and self-published a book about "teen porn and jail time," which focused on the consequences of viewing child pornography. Mother told the officer about an incident when mother saw father looking at "porn" on his computer. According to mother, father denied he was looking at pornography and claimed it was an "internet pop-up."

Mother spoke in person to agency social worker Julie Weathersby on August 16, 2012. Mother said that K.'s disclosure caused mother to go "into complete shock."

Mother told Weathersby a similar account of what she had told the responding officer a few days earlier, including that father denied sexually abusing K.; that he claimed he had only "tickl[ed] [K.] when she was little" because K. asked to be tickled;

6

and that father had written and self-published a book as part of his studies concerning the law and child pornography. Mother also told the social worker she had read a section of a story/book father was writing on his computer that included nude scenes, which mother believed had been written by father with K. in mind.

During the interview, mother told Weathersby that father (as discussed *post*) had "dabbled in child pornography," as mother admitted seeing "'terrible porn'" on his computer and stated father "could have accidently looked at underage girls." Mother also said she believed K. when K. said father had sexually abused her, as K. was not the type of person to make up such allegations. In addition, mother indicated that father used the "'same language'" (i.e., tickling) K. had used when K. reported father had sexually abused her, which mother believed corroborated K.'s accounts of abuse.

Mother told Weathersby she was concerned her husband was attracted to C., their eight-year-old daughter. Mother based this opinion on father's lack of discipline of C.; his taking C. to a hot tub almost nightly; and the smile on his face when he was with C., which mother said "'he gets when he's appealed to someone.'"

In the agency's September 2012 detention report, Weathersby noted she received several telephone calls from father the day after she met with mother. Father told Weathersby that he was "shocked" by the allegations he sexually abused K.; that the allegations came "'out of the blue'"; and that he was being "'framed for the whole thing.'" Father told Weathersby he believed K. was diagnosed with ovarian cysts when she was five or six years old and, as a result, she would come into their bedroom in the middle of

7

the night, get into their bed and he would then put his hand on her ""tummy and administer[] love and prayed with fatherly love.'" Father then spontaneously told Weathersby, "'I have no recollection of rape.'"

Shortly after the first call ended, father again called Weathersby and reported after "'wracking [his] mind'" that he and his wife, along with their 11 children, had lived in a three-bedroom house and "'anything could've happened.'" He informed Weathersby that "'on a couple of occasions during a period of time'" he helped K. when she was a child with "gas pains." Father admitted it "'sound[ed] terrible'" but, on those occasions, he would "'stand next to [K.]'" and would "'tickl[e] her abdominal area'" until she fell asleep."

Father also reported that, in April 2012, mother left him after she read a new story he had been writing about a man jailed for robbery who, on release, went into a forest in South Dakota to find money he had hidden. According to father, the man in the story came upon a "'girl'" in a tent, and the man pondered what he should do with the girl because the man had not "been with a woman in a long time." Father denied the book was about sex but noted the girl in the novel was vulnerable as she was getting dressed in the tent. Father told Weathersby that mother had become upset by the story because they too had teenage daughters who were dressing and undressing in a tent, as the family was then living in tents at a campsite, and because mother believed he might be thinking of doing the same thing with his daughters as the man in the book was considering with the

8

girl.  Father told Weathersby that mother and the children returned to the campsite a few days later as if "nothing had happened."

In the third call from father, he asked Weathersby to question K. about "'any situation of a sexual nature'" and whether K. has had any "'other sexual contact,'" including intercourse.  Father reported an incident involving his older daughter S., that he had learned about after the fact, when S. had "undressed [K.] and [A., Jr.] and [had] allowed them to watch television in the nude."[2]

T. also was interviewed about father's sexual abuse.  T. recalled when she and her mother entered the room (i.e., in February 2012) and saw father near K.  Father told them he was "'massaging [K.'s] stomach.'"  T. recalled telling father, "'[I]f I were her [i.e., K.] I wouldn't be comfortable with that and my sister [i.e., K.] agreed that she was not comfortable with that.'"

T. reported when they were "'little'" father used to "'tickle'" her even though she "'wasn't ticklish'" and even after T. asked father to stop.  T. said father did not tickle her "'in the wrong way.'"  T. recalled that when she and K. slept in a bunk bed, she heard K. "'telling him [i.e., father] to stop'"; that "'[t]his wasn't once she told him lots of times she didn't want him to tickle her'"; and that father "would be standing up by the bunk bed while he was tickling [K.]" and K. told him to "'stop.'"

T. reported father had given K. and one of her other sisters a "'promise ring'" that T. said signified they would be "'pure,'" but father would not give one to T. because T.

---

[2]    S. is not a party in this proceeding.

would not "'even let him tickle [her].'" According to T., father would give her a ring too if she let him tickle her.

The record shows Weathersby interviewed A., Jr., in late August 2012. A., Jr., told Weathersby he knew little about the allegations of sexual abuse against father other than what he had heard father tell Weathersby over the telephone. A., Jr., did say father told him that father had massaged K.'s "tummy" to help her with "tummy pain."

A., Jr., reported that he and K. had "sex" "'a long time ago'" in the garage while their sister S. was present. A., Jr., could not recall how old he was at the time of this encounter. When pressed for details, A., Jr., said that he recalled being naked and on top of K., who also was naked; that S. told him and K. "'it's fine or something like that'"; and that he was not sure whether his penis had been inside of K.'s vagina.

The record shows the agency did not remove the children from mother after the allegations of sexual abuse against father surfaced. Instead, Weathersby and law enforcement assisted mother in obtaining referrals for counseling and other services and in developing a safety plan that provided there would be no in-person contact between father and the children.

However, after spending about two weeks apart, mother allowed father to return living with the family. Weathersby received a telephone call from S., the adult sibling of K., who reported mother, father and the children were "'all living together like a happy family'" after mother "had a change of heart" when father "'confessed privately'" during a meeting with a pastor of a church. S. further reported mother believed father was

10

"broken and very sorry." S. told Weathersby that mother, father and the children sought to reside with mother's brother in early September 2012 but left the brother's residence after being told father could not stay.

Weathersby in early September 2012 also spoke to a family friend who owned the house where mother and the children had been living once the agency put in place the visitation restrictions. This person reported she told mother to leave because mother returned to the relationship with father; gave father access to the children, including to K.; and wanted father to live in the house with her and the children.

A few days later during a telephone conversation, mother admitted to Weathersby that she and father had reconciled, claiming that father had "'seduced'" her; that the children had ongoing in-person contact with father; and that father had returned to living with the family. Mother also admitted that she was aware of the directive put in place by the agency and law enforcement that father was to have no contact with the children and that she had disregarded that directive.

On or about September 7, 2012, the children were removed from their parents. That same day, father was arrested and charged under Penal Code section 288, subdivision (a) with 10 counts of lewd and lascivious acts on a child under the age of 14 years. At the September 10, 2012 detention hearing, the court found all eight children were subject to its jurisdiction under the section 300 petitions and ordered the children be detained at Polinsky Children's Center or with a licensed foster care provider. The court

also ordered supervised visitation for mother and issued a no-contact order between father and the children.

In the mid-October 2012 jurisdiction/detention report, agency social worker Shari Medeiros reported that in an interview requested by T. after the detention hearing, T. told Weathersby that father had touched her in a sexual manner. T. stated that when she was 12 years old, father put his hand down her pants while she was sleeping. T. said the family had been camping when the incident occurred, and she was not fully conscious when it happened but was certain it had occurred because her pants were unbuttoned when she awakened. T. told Weathersby she "'never looked at him [i.e., father] the same again.'" During this same interview, T. reported that in early 2012 father attempted to squeeze her thigh and that she continuously slapped his hand away. She also reported an incident when she was four years old when father put his hand on her stomach in a way that made T. uncomfortable.

A few days after the interview with Weathersby, as reported by Medeiros, T. said during a forensic interview that father "might" have unzipped her pants as she slept near her brother Jo. but denied any conscious knowledge of being sexually abused by father.

Medeiros conducted an in-person interview with father in late September 2012 in connection with the preparation of the agency's jurisdiction/disposition report. Father denied ever touching K.'s vagina, except perhaps when she was an infant and he was changing her diapers. Father stated both he and K. have gastrointestinal problems and,

when she was younger, he would "'tickle[] her tummy'" to "'administer comfort'" because he has "'warm hands.'"

Father told Medeiros he believed K. made up the sexual abuse story because she was angry with him for making her stop music lessons. Father theorized that perhaps he had "done something in his sleep" to K. because it was "his job to put the children to bed and sometimes he [was] so tired[] he [would] fall asleep in the children's beds." In response to Medeiros's point that K. was very deliberate in her description of father wetting his finger before he used it to penetrate her vagina, father further theorized that perhaps K. had seen him wet his finger before engaging in sexual activities with mother. Father then demonstrated for Medeiros, in what she described as a "vulgar gesture," how he wet his finger before engaging in sexual activity with mother, who he claimed had a dry vagina.

Medeiros also interviewed mother. Mother reported that prior to the agency's involvement, she was aware father was viewing pornography on the computer and felt this had caused father to molest K. Mother again voiced concerns about the book father had written concerning various state pornography laws and the story he was writing on his computer involving a man who, while camping, came upon a "'very young'" girl dressing in a tent. Mother reported she was upset that father had described in his story the young girl's breasts as "'tilting upward'" because, at the time, she and father had young daughters who also were getting dressed and undressed in tents.

13

Mother metaphorically described her relationship with father as being similar to that of a drug addict and drugs. Mother said if she spent time with father or "looked into his eyes," she would not be able to stop herself from getting back into a relationship with him. A few weeks after this interview, mother's brother emailed Medeiros and reported that while he was visiting mother she repeatedly said she was "'addicted to him [i.e., father]' and that he has always captivated her [i.e., mother] by his eyes." She also stated she knew she would "'go back to him when [she is] around him.'" Mother admitted to her brother that father had a "problem" with pornography.

As a result of her investigation, mother's statements and her failure to follow the safety plan, Medeiros recommended in the agency's October 16, 2012 jurisdiction/disposition report that mother needed "more time in services to demonstrate that she can protect her children and recognize unsafe individuals and/or unsafe situations."

Medeiros in the agency's December 5, 2012 addendum report stated that mother was attending individual and group therapy sessions each week and that mother's therapist indicated mother recently had been able to show improved judgment, although mother still had codependency issues. Mother's therapist opined that it was acceptable for the two youngest children, E. and Av., to be placed in mother's care, which the agency did in late November 2012. The agency continued to recommend that the court make a true jurisdictional finding as to each of the eight children and that the court remove K., A., Jr., T., J., C. and Jo. from their parents' custody.

14

B.  *Contested Adjudication/Disposition Hearing*

Before trial, the agency moved to dismiss the section 300 petitions on behalf of A., Jr., and J. because the agency deemed neither child was at substantial risk of abuse given their age and gender.  The court granted the motion, and none of the parties in this proceeding have challenged that order.  The court received into evidence the following agency reports: the September 10, 2012 detention report; the October 16, 2012 jurisdiction/disposition report; and the October 16, October 31, and December 5, 2012 addendum reports.  The court also received into evidence the "delivered service logs," prepared by Weathersby, regarding all contacts, services and visits between June 1, 2012 and December 6, 2012.

1.   Testimony of K.

At K.'s request, she testified outside the presence of mother and father.  She testified that she had been interviewed multiple times throughout the investigation; that she told the truth to the best of her recollection during each interview; and that at no time did mother tell her what to say to investigating authorities.

K.'s testimony was consistent with her statements to Weathersby and others described *ante*: that from the time she was about five or six years old until she was 12, father digitally penetrated her vagina with his finger.  K. stated that father did this to her more than 10 times; that she could not be sure if he did this more than 100 times; that it made her feel "very disgusted"; that several times she told father to stop and if he wanted to touch someone in that "sort of place, it should be with his wife"; and that she never

15

knew when father would molest her, which made her constantly worried and scared. K. said father told her he put his finger in her vagina to make her "tummy" feel better, even when K. did not complain of stomach pain.

K. testified when she was about 12 years old she told father again to stop penetrating her vagina; he became "very emotional," said K. was his "tickle buddy" and "made [her] feel bad for telling him to stop." She stated that it was "very hard" telling father to stop; that she worried he would not love her the same; and that she felt like father's wife. K. said she would pray mother would catch father sexually abusing her so that the abuse would stop.

K. testified one time father made her touch his penis and put his penis near her vagina. K. could not remember exact details when this occurred but recalled it happened in the "nighttime."

K. testified she did not tell mother about the sexual abuse when it was occurring because father wanted it to be their "little secret," and K. did not want to be a "secret breaker." She also was afraid to tell. However, K. finally told mother about the sexual abuse by father because K. feared that father might sexually abuse her younger sister C. K. saw C. on more than one occasion straddling father while doing sit-ups on his lap, just like K. had done with father when she was young. In addition, father was spending more time with C. than with the other children and was protective of her if another family member attempted to discipline C. K. noted these behaviors by father were consistent with the behaviors he had exhibited toward her when she was young.

16

2.  Testimony of T.

Like her sister, T. testified outside the presence of mother and father by request. T. testified that she was interviewed by multiple people throughout the investigation; that she told the truth to the best of her recollection in each interview; and that at no time did anyone, including mother, tell her what to say to investigating authorities.

T. testified that she and K. slept in a bunk bed when they were younger, with K. sleeping on the top bunk. T. recalled father often came into their room at night, put his arms on the side of the bed in such a way that they were extended straight in front of him and touched K., although T. did not see father touch K.'s "private parts." T. said she felt father liked K. more than her because he would touch K. and would not touch T.

T. testified father put his hands down her pants. T. could not recall details about this touching because she was sleeping but did say when she awakened, "his hands were in my pants." T. stated that there were other times when father would squeeze the top of her knee, arm and stomach and that this touching made her uncomfortable. When T. told father to stop this touching, he instead would "do it more."

T. testified father treated K. differently than the other children. Father let K. "get by with stuff more" than her siblings, and father purchased more items for K. than he did for the rest of his children, including T., which made T. feel bad. T. stated father treated K. like she was the "mom of the family." T. noticed in the last year father was beginning to treat her younger sister C. differently than her siblings, including not disciplining C. as much as the other children.

17

### 3. Testimony of A., Jr.

The stipulated testimony for A., Jr., was that he had neither been inappropriately touched by father nor had he seen father inappropriately touch or "tickle" K. or his other siblings. A., Jr., did not think father "'play[ed] favorites'" among the children. A., Jr., never saw pornography or inappropriate pictures in the family home.

### 4. Testimony of J.

The stipulated testimony for J. was that he had never been touched by father in a way that made him feel uncomfortable or feel "icky." J. wanted to live with mother and father and felt father treated him and his siblings equally. J. saw father tickle T. under her armpits but was unsure whether he saw father tickle K.

### 5. Testimony of R.

R. testified she was 24 years old and the eldest child of mother and father. R. stated that she did not see any sexual abuse of K. or T. by father and that father had not sexually abused her.

### 6. Testimony of S.

S. testified she was 22 years old and the adult daughter of mother and father. S. stated she did not see "anything" while living with the family that suggested K. was being sexually abused. S. felt that father treated K. with favoritism.

### 7. Testimony of Mother

Mother testified she told Weathersby that father viewed pornography but did not recall telling Weathersby she saw "terrible porn" on father's computer. Mother also did

18

not recall telling Weathersby father accidently could have looked at images of underage girls on his computer and denied she told Weathersby "or anybody else" father "dabbled in child pornography." Mother also said she told Weathersby there would not be any pornography on father's computer because he was "careful."

Mother testified K. had integrity, and mother did not believe K. was making up the story she was sexually abused by father. Mother also stated she started to see "some patterns" and "similarities" between the way father was treating C. and how he had treated K. when she was younger, which caused mother concern. After K. told her what happened, mother stated she would not leave K., C. or Av. alone with father "[b]ecause of the propensity of a future molestation."

Mother testified she confronted father at the campsite after K. disclosed she was sexually abused by him. Mother did not ask father whether it was true but rather said, "'Your sin of pedophilia has been exposed. [K.] told me everything.'" Father responded, "tell me what happened," or words to that effect, to which mother said, "'You tell me what happened. You were there.'" According to mother, father did not respond then but later said all he could remember is he would "tickle" K. because "she had tummy pains."

Mother also testified she was at a meeting with father and a church pastor when father said, "I'm not a child molester, but I'm definitely not sinless." Mother believed father was "making it right between himself and God" and showed "some repentance" for what he had done to K. when he said, "I'm definitely not sinless."

19

8. Testimony of Weathersby

Weathersby testified she worked for the agency for more than 12 years. Weathersby testified that as part of her investigation of this case she met with mother on August 16, 2012 and, during that interview, she "distinctively recalled" mother saying she had seen "child pornography on [father's] computer and that it had concerned her."

Weathersby also testified that during this same interview mother told Weathersby she had seen "some terrible porn" on father's computer and that "he could have accidently looked at underage[] girls." Finally, Weathersby confirmed that during their interview, mother said father would take C. to the hot tub "almost nightly."

9. Testimony of Medeiros

Medeiros testified she worked for the agency for 12 years. Medeiros opined the court declare K., T., C., Jo., E. and Av. dependents and remove K., T., C. and Jo. from their parents' custody. Medeiros recommended that K., T., C. and Jo. be removed from the custody of mother because: mother in the past had been unable to stand up to father; if mother was responsible for all the children, she would resume a relationship with father to assist her in caring for the children if and when he was released from jail; and mother needed more time in services to demonstrate stability and help in her decisionmaking. Medeiros recommended short, unsupervised daytime visits for mother.

Specifically, Medeiros testified T. was at substantial risk of sexual abuse by father as a result of the following factors: father sexually assaulted K.; T. was a 13-year-old girl and was just a year older than K. when father inappropriately touched K.; father put his

hands down T.'s pants while she was sleeping in the campsite; and father's unwanted touching of T. and his refusal to respect her boundaries, including when he touched her thigh and arm and refused to stop the touching after T. repeatedly pushed his hand away.

Medeiros testified C. also was at substantial risk of sexual abuse by father based on the following factors: C.'s age and gender; father appeared to favor C.; and father engaged in certain "grooming" behaviors with C. that in the past he had done with K., including having the child do sit-ups on his lap, isolating C. from other family members and treating her differently than he treated her siblings by disciplining C. less and buying her more things.

Regarding E., Medeiros testified E. was at substantial risk of sexual abuse based on her age and gender. Medeiros noted E. was "very vulnerable," as E. was nearing the age when father started sexually abusing K.

Medeiros opined that Av., who was less than two years old, was at substantial risk of sexual abuse because of her age and gender and because she would not be able to verbalize if there was such an occurrence.

Finally, as to Jo., Medeiros stated he too was at substantial risk of sexual abuse because he was six years old and because it appeared father's deviant behavior was escalating. Unlike his older brothers, A., Jr. and J., Medeiros opined that Jo. was still too young to stand up to his parents if abuse occurred because, at six years old, Jo. still saw his parents as "authority figures."

21

Other factors Medeiros considered when she opined these children were at risk were the father's refusal to stop unwanted touching; the social isolation of the children by mother and father, including years of homeschooling the children; the secret-keeping; and father's interest in pornography, including his book that dealt with child pornography laws.

10. Juvenile Court's Ruling

The court sustained the section 300, subdivision (d) petition as to K. and the section 300, subdivision (j) petitions as to T., C., Jo., E. and Av. On the issue of disposition, the court declared all six children dependents but removed K., T., C. and Jo. from the physical custody of mother and father. K. and T. were placed in the approved home of a nonrelated extended family member, and C. and Jo. were placed in the approved home of a relative. As noted *ante*, E. and Av. were placed with mother.

DISCUSSION

A. *Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if

22

there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Moreover, "[e]vidence from a single witness, even a party, can be sufficient to support the trial court's findings. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) The agency has the burden of proving by a preponderance of the evidence that the children are dependents of the court under section 300. (§ 355, subd. (a); see also *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) Once met, the "appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

B. *Sibling Abuse—Subdivision (j) of Section 300*

1. Guiding Principles

Section 300, subdivision (d) invokes the jurisdiction of the juvenile court and permits the court to declare a child a dependent of the court when "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . ." Here, neither mother nor father challenges the finding of the juvenile court that father sexually abused K.

23

Instead, they (separately) challenge the true jurisdictional finding on the section 300, subdivision (j) petition only as to Jo.[3] They each contend the evidence in the record was insufficient to establish that Jo., a six-year-old boy, was at substantial risk of being sexually abused because each contends there is no evidence whatsoever that father had sexually abused, or had any interest in engaging in sexual activity with, his male children, including Jo.

Subdivision (j) of section 300 applies and gives the juvenile court jurisdiction over a child when the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

Recently, our high court unanimously held that substantial evidence supported the juvenile court's assertion of jurisdiction over the sons of the defendant father under section 300, subdivision (j) despite the lack of evidence the defendant sexually abused them or they witnessed any of the sexual abuse by the defendant against their sibling sister. (*In re I.J.*, *supra*, 56 Cal.4th at p. 770.) In reaching its decision, the court noted that "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or

---

3  On March 28, 2013, we denied father's request for appointment of appellate counsel for Jo.

being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*Id.* at p. 773.)

Like the situation in the instant case, the focus of the court in *In re I.J.* was on subdivision (j) of section 300. The court noted this provision "applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. (§ 300, subd. (j).) Here, father sexually abused the boys' sister as defined in subdivision (d). So the first requirement is met. At issue is the second requirement. '[S]ubdivision (j) was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). . . .' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 774.)

"Unlike the other subdivisions, subdivision (j) includes a list of factors for the court to consider: 'The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' (§ 300, subd. (j).) 'The "nature of the abuse or neglect of the sibling" is only one of many factors that the court is to consider in assessing whether the child is at risk of abuse or

25

neglect in the family home. Subdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those subdivisions. [¶] The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 774.)

Our high court in *In re I.J.* recognized there was a split of authority regarding whether the sexual abuse of a female child, standing alone, was sufficient to demonstrate a substantial risk of abuse to a male sibling. (*In re I.J.*, *supra*, 56 Cal.4th at pp. 774-775.) "Some of these cases are distinguishable from this one and each other, in that some of the cases upholding the jurisdictional finding contained additional evidence that is lacking here. But to some extent, the cases simply disagree with each other. The majority [of the Court of Appeal] below agreed with the cases finding the evidence sufficient, while the dissent agreed with the cases finding the evidence insufficient.

"Two typical cases upholding the jurisdictional finding are *In re P.A.* [(2006)] 144 Cal.App.4th 1339 and *In re Karen R.* [(2001)] 95 Cal.App.4th 84. The *Karen R.* court said that 'a father who has committed two incidents of forcible incestuous rape of his

26

minor daughter reasonably can be said to be so sexually aberrant that both male and female siblings of the victim are at substantial risk of sexual abuse . . . . Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial. Given the facts of this case, the juvenile court reasonably could conclude every minor in the home, regardless of gender, was in substantial danger of sexual abuse by father.' (*In re Karen R.*, *supra*, at pp. 90–91.)

"In *P.A.*, the juvenile court sustained an allegation that the father had sexually abused his daughter by touching her vagina under her clothes and on top of her underwear. (*In re P.A.*, *supra*, 144 Cal.App.4th at pp. 1341, 1343.) There was no evidence the father had inappropriately touched or otherwise sexually abused his sons, and it appeared the boys were unaware of the abuse. (*Id.* at p. 1345.) Nevertheless, relying in part on *In re Karen R.*, *supra*, 95 Cal.App.4th 84, the court upheld the jurisdictional finding as to the sons. It acknowledged that the abuse in its case was 'less shocking than the abuse in *Karen R.*,' but it was 'convinced that where, as here, a child has been sexually abused, any younger sibling who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse. As we intimated in *Karen R.*, aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior.' (*In re P.A.*, *supra*, at p. 1347.)

"The *P.A.* court found its conclusion 'consistent with section 355.1, subdivision (d), which provides in pertinent part that: "(d) Where the court finds that either a parent,

27

a guardian, or any other person who resides with . . . a minor who is currently the subject of the petition filed under Section 300 . . . (3) has been found in a prior dependency hearing . . . to have committed an act of sexual abuse, . . . that finding shall be prima facie evidence in any proceeding that the subject minor is a person described by subdivision (a), (b), (c), or (d) of Section 300 and is at substantial risk of abuse or neglect.  The prima facie evidence constitutes a presumption affecting the burden of producing evidence."  [¶] Although section 355.1, subdivision (d), was not triggered here because there was no prior dependency proceeding at the time of the jurisdictional hearing, it nonetheless evinces a legislative determination that siblings of sexually abused children are at substantial risk of harm and are entitled to protection by the juvenile courts.'  (*In re P.A.*, *supra*, 144 Cal.App.4th at p. 1347.)

"A relatively early case overturning the jurisdictional finding is *In re Rubisela E.* [2000] 85 Cal.App.4th 177.  The *Rubisela E.* court did 'not discount the real possibility that brothers of molested sisters can be molested [citation] or in other ways harmed by the fact of the molestation within the family.  Brothers can be harmed by the knowledge that a parent has so abused the trust of their sister.  They can even be harmed by the denial of the perpetrator, the spouse's acquiescence in the denial, or their parents' efforts to embrace them in a web of denial.'  (*Id.* at p. 198.)  But, the court found, 'in the case at bench, while such a showing is possible, there has been no demonstration by the department that "there is a substantial risk [to the brothers] that [they] will be abused or neglected, as defined in . . . [the applicable] subdivisions" . . . .'  (*Id.* at p. 199.)

28

"Relying partly on *In re Rubisela E.*, *supra*, 85 Cal.App.4th 177, the *Maria R.* court 'disagree[d] with prior cases to the extent that they have held, either explicitly or implicitly, that a parent's sexual abuse of a daughter, either alone or in combination with a factor or factors that have no established correlation with sexual abuse, is sufficient to establish that the parent's son is at risk of sexual abuse by that parent . . . .'  ([*In re*] *Maria R.* [2010] 185 Cal.App.4th [48,] 63.)  It agreed with *Rubisela E.* 'that the brothers of molested girls may be harmed by the fact of molestation occurring in the family,' but it did not 'agree with prior cases to the extent that they have held or implied that the risk that the brothers face may—in the absence of evidence demonstrating that the perpetrator of the abuse may have an interest in sexually abusing male children—be deemed to be one of "sexual abuse" within the meaning of subdivision (d). . . .  [T]he phrase "sexual abuse" for purposes of section 300 is defined by reference to the offenses enumerated in Penal Code section 11165.1, whether the allegation of sexual abuse is filed under subdivision (d) or (j).  [Citation.]  Penal Code section 11165.1 refers to specific sex acts committed by the perpetrator on a victim . . . and *does not include* in its enumerated offenses the collateral damage on a child that might result from the family's or child's reaction to a sexual assault on the child's sibling.' (*Maria R.*, *supra*, at pp. 67–68.)

"The *Maria R.* court noted that '[n]one of the courts that have held or impliedly concluded that a child, regardless of gender, whose sibling was sexually abused, may be found to be at risk of *sexual abuse* under subdivision (d), either directly or under subdivision (j) [of section 300], has cited any scientific authority or empirical evidence to

29

support the conclusion that a person who sexually abuses a female child is likely to sexually abuse a male child. [(Citing *In re P.A.*, *supra*, 144 Cal.App.4th 1339, and *In re Andy G.* [2010] 183 Cal.App.4th 1405.)] In the absence of evidence demonstrating that a perpetrator of sexual abuse of a female child is in fact likely to sexually abuse a male child, we are not persuaded that the rule of general applicability enunciated in *P.A.*, and repeated by the *Andy G.* court, is grounded in fact. For this reason, we decline to adopt the reasoning of *P.A.* and *Andy G.*' (*Maria R.*, *supra*, 185 Cal.App.4th at p. 68.) The court concluded that '[s]ince there is no evidence in the record that would tend to support a finding that [the father] has an interest in engaging in sexual activity with a male child, we cannot . . . conclude that [the father's] sexual abuse of his daughters—as aberrant as it is—establishes that [the son] is at substantial risk of *sexual abuse* within the meaning of subdivision (j), as defined in subdivision (d) and Penal Code section 11165. 1.' (*Ibid.*)

"We agree with the majority below that the evidence in this case was sufficient to support the juvenile court's dependency finding. Among the factors cited in subdivision (j) for the court to consider are the circumstances surrounding, and the nature of, father's sexual abuse of his daughter. By citing these factors, subdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. (§ 300, subd. (j).) 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . [¶] . . . [¶] . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine

30

whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse.

"The majority below accurately described father's behavior as 'aberrant in the extreme: he sexually abused his own daughter "by fondling the child's vagina and digitally penetrating the child's vagina and forcefully raped the child by placing the father's penis in the child's vagina."' Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse. '[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role. Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody. (See § 300, subds. (d), (e), (j).)' (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76–77.) The serious and prolonged nature of father's sexual abuse of his daughter under these

31

circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children.

"The *Maria R.* court criticized cases like *In re P.A.*, *supra*, 144 Cal.App.4th 1339, for not citing scientific authority or empirical evidence to support the conclusion that a father who abuses his daughter is likely to abuse his son. (*Maria R.*, *supra*, 185 Cal.App.4th at p. 68.) But nothing in the statutes suggests a legislative intent to *require* a court to consult scientific authority or empirical evidence before it makes the 'substantial risk' determination. The specific factors the Legislature stated in section 300, subdivision (j) do not include such evidence. Rather, after considering the nature and severity of the abuse and the other specified factors, the juvenile court is supposed to use its best judgment to determine whether or not the particular substantial risk exists. As the majority below noted, 'It is of course impossible to say what any particular sexual predator—and here a predator who has raped his own daughter—is likely to do in the future in any particular instance. But in our view that very uncertainty makes it virtually incumbent upon the juvenile court to take jurisdiction over the siblings . . . .'

"Another statute that does not directly apply here supports the conclusion that a court need not consult scientific authority before it finds the requisite substantial risk when a parent has sexually abused a sibling. Section 355.1, subdivision (d), provides that a prior finding of sexual abuse (of anyone, not just a sibling) is prima facie evidence that the child who is the subject of the dependency hearing is subject to the court's jurisdiction under section 300. When it enacted subdivision (d) of section 355.1, the Legislature

32

found 'that children of the State of California are placed at risk when permitted contact with a parent or caretaker who has committed a sex crime. Further, the Legislature finds that children subject to juvenile court dependency jurisdiction based on allegations of molestation are in need of protection from those persons.' [Citation.] Nothing in this subdivision suggests it is limited to sexual abuse of a person of the same gender as the child before the court.

"Father correctly argues that section 355.1 does not apply here because there was no finding in a *prior* proceeding that he committed sexual abuse. But neither the *P.A.* court, nor the Court of Appeal here, nor the Department contends it does apply. Rather, section 355.1 is relevant because it evinces a legislative intent that sexual abuse of someone else, without more, at least *supports* a dependency finding. (See *In re P.A.*, *supra*, 144 Cal.App.4th at p. 1347.)

"Citing empirical studies, father argues that when a father sexually abuses a daughter, his sons are at significantly lower risk of sexual abuse than are his other daughters. Amicus curiae California State Association of Counties challenges father's statistics and argues that empirical studies show the risk to boys when a sister is abused is greater than father argues. We need not examine these studies in detail. For present purposes, we may assume that father's other daughter is at greater risk of sexual abuse than are his sons. But this does not mean the risk to the sons is nonexistent or so insubstantial that the juvenile court may not take steps to protect the sons from that risk. 'Although the danger of sexual abuse of a female sibling in such a situation may be

33

greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.' (*In re Karen R.*, *supra*, 95 Cal.App.4th at p. 91.) The juvenile court need not compare relative risks to assume jurisdiction over all the children of a sexual abuser, especially when the abuse was as severe and prolonged as here.

"The juvenile court's assumption of jurisdiction under section 300 does not itself mean father will lose all parental rights. 'A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care. But it is merely a first step, and the system includes many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare.' (*In re Ethan C.* (2012) 54 Cal.4th 610, 617.) All we are holding at this point is that when a father severely sexually abuses his own child, the court may assume jurisdiction over, and take steps to protect, the child's siblings.

"We agree with the Court of Appeal's conclusion. 'The juvenile court is mandated to focus on "ensur[ing] the safety, protection, and physical and emotional well-being of children who are at risk" of physical, sexual or emotional abuse. (§ 300.2.) That is what the court did here.' As we noted earlier, the juvenile court found, 'by clear and convincing evidence, . . . that there is a substantial danger to the children, if returned to the home, to the physical health, safety, protection, physical, emotional well-being of the children, and there are no reasonable means by which the children's physical health can

34

be protected without removing the children from the father's custody in this case.' In upholding the assertion of jurisdiction in this case, we are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused. We merely hold the evidence in this case supports the juvenile court's assertion of jurisdiction. [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at pp. 774-780, fn omitted.)

2. <u>Analysis</u>

Relying on the holding and reasoning of *In re I.J.*, as we must, we conclude mother and father have each failed to show there is no substantial evidence in the record to support the true jurisdictional finding of the juvenile court that Jo. was at substantial risk of abuse or neglect as provided in subdivision (j) of section 300, based on the undisputed finding his sibling K. was sexually abused as provided in subdivision (d) of section 300.

The record shows father's behavior towards his daughter K. was "'aberrant in the extreme.'" (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.) Father repeatedly sexually abused K. when she was about five or six years old until she was 12 by licking his finger (as he demonstrated for Medeiros) and inserting it into K.'s vagina, where he would move it in and out of her. K. estimated this sexual abuse occurred about twice a week.

Father's sexual abuse of K. often occurred in the presence of her siblings. K. testified father sexually abused her while she lay in the top bunk of a bunk bed she shared with her younger sister, T., who slept below her on the bottom bunk. T. confirmed father

often came into the girls' room and "tickled" K., while refusing to "tickle" T., despite K.'s pleas for him to stop.

The record also shows father sexually abused K. "the whole ride home" as she sat in the front seat of a car driven by father as her siblings slept in the back seat. When they arrived home, father put K.'s siblings to bed. Father then took K. to his bed, made her touch his penis with her hand and then put his penis near K.'s vagina.

Father also repeatedly sexually abused K. when, as a child, she came into her parents' bedroom in the middle of the night for comfort and affection. On a few occasions, father also sexually abused K. in the garage of the family home, where father had an office.

Father told K. he was merely "tickling" her when he sexually abused her by digitally penetrating her vagina. He referred to K. as his "tickle buddy" and told her not to tell anyone. When K. was diagnosed with ovarian cysts at 12 years of age, father drew a picture of a vagina and discussed how his "tickling" of K. allegedly caused endorphins to be released to make her feel better.

The record shows father in February 2012 came into the room where K. was resting after she had a root canal. Father went behind K. and lay in a position K. described as "weird" and mother described as "awkward," after mother and T. unexpectedly entered the room. Although K. did not tell mother then about father's sexual abuse, K. prayed mother would come home and "catch" father sexually abusing her so that it would stop.

36

Also relevant to the totality of the circumstances surrounding the sibling abuse is the uncontroverted evidence that father was engaging in similar behaviors with his younger daughter, C.—who was merely two years older than Jo.—that he had engaged in with K. when she was a young child, as testified to by K. Mother also testified she was concerned by father's behavior toward C. and, at one point, told social worker Weathersby that father was attracted to C.

Furthermore, T. also reported that father recently had put his hands down her pants while she was semi-unconscious as she slept next to *Jo.* in a tent and that she awakened to find her pants unbuttoned.

The record also shows mother was concerned enough about a story father was in the process of writing involving a man who, after being released from jail, came upon a "very young" girl dressing in a tent, to take the children and leave father and their campsite for a few days because mother perceived father may have been writing the story about K. and because mother recognized her daughters, like the character in father's story, were dressing and undressing in tents.

Further, the record shows father was unwilling to respect certain boundaries when it came to certain of his children, including T., who repeatedly told father to stop touching her and who, in response, would touch her more.

The record also shows father's behavior was unpredictable as K. never knew when or where father would sexually abuse her, as evidenced by father's inappropriate behavior

toward K. when she was 17 years old as she was resting while recovering from a root canal.

From the foregoing, we conclude there is overwhelming evidence that father's sexual abuse of K. was "serious and prolonged." (See *In re I.J.*, *supra*, 56 Cal.4th at p. 778.) As such, and, based on the totality of these circumstances, including Jo.'s age—which was similar to the age when father began to abuse K. and nearly the age when father appeared to be "grooming" C. for sexual abuse—we further conclude the record contains substantial evidence to support the juvenile court's true finding under section 300, subdivision (j) that Jo., despite being a male, was at substantial risk of sexual abuse by father. (See *In re I.J.*, *supra*, at pp. 779-780.)

Father, however, contends the statement he "dabbled in child pornography" in the section 300, subdivision (j) petition filed on behalf of Jo. should be stricken for lack of substantial evidence. Initially, we note that regardless of whether this statement is stricken from the petition, there is substantial *other* evidence in the record, as summarized *ante*, that Jo. is at substantial risk of sexual abuse as defined in subdivision (j) of section 300. In any event, we disagree with father's contention.

Weathersby testified mother initially disclosed that she saw "terrible porn" on father's computer and that father "could have accidently looked at underage girls." After father was charged under Penal Code section 288, subdivision (a) with 10 counts of lewd and lascivious acts on a child under the age of 14 years, mother testified she did not make these statements, or could not recall making them, to Weathersby. The social worker in

38

rebuttal testified mother did in fact make these statements, as reflected in Weathersby's September 2012 detention report.

In addition, the record shows mother was concerned by the story father was writing about a "very young" girl dressing in a tent.

On this record, we conclude there is sufficient evidence in the record to support the allegation in the petition that father "dabbled in child pornography." (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773 [noting a court of review does not """reweigh the evidence or exercise independent judgment, but merely determine[s] if there are sufficient facts to support the findings of the trial court"""].)

C. *Removal Order*

Mother separately contends the juvenile court's order removing K., T., C. and Jo. from her custody pursuant to section 361, subdivision (c)(4) was not supported by clear and convincing evidence. There is a disagreement between the agency, on the one hand, and counsel for the children including C. and Jo., on the other, whether the record contains clear and convincing evidence to support the removal of these two children from mother's custody.

The agency contends the portion of the order removing C. and Jo. from mother's custody should be reversed because neither child was afraid to return to mother and because there was, in any event, services available to alleviate the risk of abuse. Minors' counsel disagrees and contends there is clear and convincing evidence in the record to

support the finding that C. and Jo. were at substantial risk of harm unless removed from mother's custody.

We are not bound to accept the concession of the agency on this issue. (See *Desny v. Wilder* (1956) 46 Cal.2d 715, 729.) We thus turn to the merits of this issue.[4]

### 1. Guiding Principles

As relevant here, section 361, subdivision (c)(1), provides a "dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] . . . [¶] (4) The minor or a sibling of the minor has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by a parent, guardian, or member of his or her household, or other person known to his or her parent, and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from his or her parent or guardian, or the minor does not wish to return to his or her parent or guardian."

A decision to remove a child from the physical custody of a parent or guardian is reviewed under the substantial evidence standard. (*In re Kristin H.* (1996) 46

---

[4]    Because the dispute between minors' counsel and the agency regarding the removal of C. and Jo. from mother's custody arose *after* mother and father had separately replied to the respondent's brief of the agency, on our own motion we afforded mother and father each the opportunity to file a supplemental letter brief *responding* to the contention of minors' counsel that there is clear and convincing evidence in the record supporting the removal under section 361, subdivision (c)(4) of C. and Jo. from mother's custody. Neither party filed a response.

Cal.App.4th 1635, 1654.)  As noted *ante*, in making this determination, we review the record in the light most favorable to the juvenile court's determinations, we do not reweigh the evidence or exercise independent judgment and we merely determine if there are sufficient facts to support the findings of the trial court.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing" and "decide where the child will live while under the court's supervision."  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  "The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home."  (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 135.)  "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  (*Ibid.*)  "The court may consider a parent's past conduct as well as present circumstances.  [Citation.]"  (*In re. N.M.*, *supra*, at p. 170.)  If a court finds by clear and convincing evidence that the child's welfare requires removal due to sexual abuse or a substantial risk of sexual abuse, and there are no reasonable alternatives to protect the child or the child does not wish to return to his or her parent, a removal order is appropriate.  (See § 361, subd. (c)(4).)

2.  Analysis

Given there is overwhelming evidence in the record that (i) father repeatedly and over the course of years sexually abused K. within the meaning of subdivision (d) of section 300, and (ii) T., C. and Jo. were at substantial risk of being sexually abused

41

within the meaning of subdivision (j) of that statute, we turn to the second part of section 361, subdivision (c)(4), which requires the additional showing by clear and convincing evidence that there are "no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from his or her parent, or the minor does not wish to return to his or her parent . . . ."

At the time of the jurisdiction/disposition hearing, K. was four months shy of turning 18 years old and was living in the approved home of a nonrelative extended family member. K. stated her desire to continue in this living arrangement and *not* to return living with mother. As such, we conclude there is clear and convincing evidence in the record to support the juvenile court's order removing K. from the physical custody of mother pursuant to subdivision (c)(4) of section 361.

As to T., the record shows she was living with the same nonrelative extended family member as K. However, unlike the evidence regarding K., the record is silent regarding whether T. wished to continue living with her sister in this arrangement. Thus, the question becomes whether there is clear and convincing evidence in the record to support the (tacit) finding of the juvenile court under subdivision (c)(4) of section 361 that there were "no reasonable means" to protect T. (and her siblings C. and Jo.) from a substantial risk of sexual abuse.

Here, the record shows before K. disclosed the prolonged sexual abuse by father that was "'aberrant in the extreme'" (see *In re I.J.*, *supra*, 56 Cal.4th at p. 778), mother was concerned by certain behaviors of father that were sexual in nature pertaining to their

42

children. For example, the record shows mother took the kids and left father for a few days in April 2012—just a few months before K. disclosed she had been sexually abused by father—because mother read the story father had written about the "very young" girl dressing in a tent at a campsite. Mother reported the story concerned her because she thought the very young girl in father's story was written with K. in mind.

Mother also reported that before K.'s disclosure and the agency's involvement, she was "'not happy'" with father for writing a book that included a compilation of state laws on pornography and "specifically the age that a female was considered an adult and could freely engage in specific sexual behavior/acts."

The record also shows about six months before K. disclosed the sexual abuse, mother and T. unexpectedly entered a room and found father resting behind K. in a "'very awkward'" position. Mother told father to get off of K. and later talked to K. about what had occurred that day. K., however, did not tell mother then about father sexually abusing her.

Moreover, mother observed behaviors by father that suggested he was attracted to their eight-year-old daughter C. K. observed the same thing. In fact, it was K.'s concern for her younger sister C. that led K. to disclose to mother in mid-August 2012 that father had sexually abused her, a disclosure that, despite mother's previous concerns, caused mother to go "into complete shock."

The record shows immediately after K.'s disclosure, mother confronted father at the family campsite, told father K. had told her everything and said to father: "'Your sin

43

of pedophilia has been exposed.'" Father then told mother all he could remember is he would "tickle" K. because "she had tummy pains." Mother found it suspicious that father used the same word, "tickle," that K. had used when she disclosed the sexual abuse by father.

Mother took the children and left father after K.'s disclosure. Mother also contacted police. Once involved, the agency did not remove any of the children from mother's custody but instead assisted mother in obtaining referrals for counseling and other services and in developing a safety plan that provided there would be no in-person contact between father and the children.

The record shows mother reunited with father after about two weeks. Out of concern for the children, both S. and the family friend, who owned the house where mother and the children had been residing after the sexual abuse allegations surfaced, separately contacted Weathersby. S. reported the family was living together "like a happy family" and had unsuccessfully sought to live as a family with mother's brother. The family friend reported she had asked mother to leave because mother and father had reconciled, mother gave father access to the children, including to K., and mother wanted father to live with the family in the house.

In response to this information, Weathersby contacted mother who admitted in reconciling with father she disregarded the no-contact directive put in place by the agency and law enforcement. Mother reported father had "seduced" her, and she had allowed father to have in-person contact with the children.

The record further shows mother placed K. in the home of another family friend in early September 2012. A few days later, mother called the home about 11:20 p.m., acted aloof and said she wanted to pick up K. immediately. Because of the hour, the friend refused. However, early the following morning, mother came to the residence in what the family friend described as "'some kind of a weird frenzy'" to pick up K. because mother was "'in fear of her family being broken up.'"

The record also shows Medeiros voiced concerns about mother's ability to stand up to father and felt mother required additional time and progress in service programs to be a protective parent.

From the foregoing, we conclude there is clear and convincing evidence in the record supporting the juvenile court's order removing T., C. and Jo.[5] from mother's physical custody pursuant to subdivision (c)(4) of section 361, as the evidence both before and after K. disclosed father sexually abused her supports the (tacit) finding of the court that there were "no reasonable means" by which these children could be "protected from a substantial risk of sexual abuse" without removing them from mother.[6] (See *In re*

---

[5]     Although, as noted *ante*, we conclude K.'s desire to remain in her current placement with a nonrelative family member separately satisfied subdivision (c)(4) of section 361, our conclusion with respect to T., C. and Jo. that there is clear and convincing evidence in the record that there was no "reasonable means" to protect them from a substantial risk of sexual abuse applies with equal force to K., the victim, and provides an alternate ground on which to affirm her removal from mother's custody.

[6]     In light of our conclusion, we deem it unnecessary to decide whether the finding of the juvenile court to remove K., T., C. and Jo. from mother's custody was proper under subdivision (c)(1) of section 361 (i.e., removal proper when "[t]here is or would be a

*Jason L.* (1990) 222 Cal.App.3d 1206, 1218-1219 [when a juvenile court fails to state a factual basis for an order we may imply the basis from the evidence]; *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169-1170 [noting a parent's past conduct is a good predictor of future behavior].)

Mother, however, contends the juvenile court erred in removing K., T., C. and Jo. because there is substantial evidence in the record she was "fully capable" of providing her children protection from a substantial risk of sexual abuse, as demonstrated by, among other evidence, her taking the children and calling police after she learned K. had been sexually abused by father; by the progress she made thereafter in service programs; and by the fact the agency placed E. and Av. in mother's care in November 2012. We disagree. Mother's contention is tantamount to a request of this court to reweigh the evidence, independently evaluate the credibility of witnesses and resolve conflicts in the evidence, none of which we can do. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; see also *In re Laura F.* (1983) 33 Cal.3d 826, 833.)

Moreover, that father was incarcerated at the time of the jurisdiction/disposition hearing in December 2012 is not determinative regarding removal of the children because as mother recognizes, "the criminal court, not the juvenile court, was in charge of [father's] continued incarceration and the juvenile court had a duty to consider the possibility, even if only theoretical, that [father] might be released." (See *In re T.V.*, *supra*, 217 Cal.App.4th at p. 133 [noting the question in determining whether a child

substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor"), as the agency and minors' counsel alternatively contend.

needs the juvenile's court protection "'is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm'" and noting past events also may be relevant in this inquiry].)

## DISPOSITION

We affirm in their entirety the orders of the juvenile court (1) sustaining the section 300, subdivision (j) petition filed on behalf of Jo. and (2) removing K., T., C. and Jo. from mother's physical custody pursuant to section 361, subdivision (c)(4).


BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.

47